437 P.2d 988

**Roger Lee WONES, Deceased, Goldie Wones, Widow, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona and Byron's Inc. (Byron's Town House), Respondents.**

**No. I CA–IC 145.**

Court of Appeals of Arizona.

Feb. 29, 1968.

Rehearing Denied March 27, 1968.

Review Denied April 23, 1968.

Caine, Brigham & Hocker, by R. Kelly Hocker, Tempe, for petitioner.

Robert K. Park, Chief Counsel, by Donald L. Cross, Phoenix, for respondent The Industrial Commission.

DONOFRIO, Judge.

This case is before the court on a writ of certiorari granted on the petition of Goldie Wones, widow of Roger Lee Wones, to review the lawfulness of an award and findings of The Industrial Commission of Arizona issued March 23, 1967. The award denied death benefits to the widow, finding that the death of the decedent was neither caused nor precipitated by the industrial episode sustained by him on July 17, 1964; nor was his death the result of an injury by accident arising out of and in the course of his employment.

The decedent, Roger Lee Wones, was injured on July 17, 1964, when he slipped on grease on the floor of his employer's kitchen, fell backward and struck his back against a workbench. Decedent was employed as a chef on the date of the accident.

Immediately following the accidental injury, the decedent began experiencing pains and numbness in his entire right leg. He consulted his family physician the following day, and was hospitalized on July 19, 1964. He was treated conservatively without success until it became apparent that surgery would be required. On September 2, 1964 he was admitted to a hospital for a neurological examination. As a part of the examination he was given an electrocardiogram on September 8, 1964, which was read as "probably normal". He was seen in group consultation on September 16, 1964 and underwent surgery on September 21, 1964. The surgery consisted of an exploration of the spine, the removal of a herniated

disc material and the excision of a false joint at the L¾ level. Decedent was discharged on September 30, 1964 and spent the month of October convalescing at home. On October 30 decedent began to experience acute distress from urinary retention. He was readmitted to the hospital on the 1st of November with a diagnosis of acute muscle spasm, urinary retention and referred pain in his leg. He was discharged from the hospital on November 13 and sent home, where he died on November 15, 1964. Decedent was alone at the time of his death.

The record shows that decedent spoke with his sister Isabel Peterson, by long distance telephone shortly before his death. Mrs. Peterson's deposition is a part of the record, and she related that decedent complained of acute pain in his back, and told her that the pain was "actually killing me."

An autopsy was performed the day following death. The final anatomical diagnoses was as follows:

"FINAL ANATOMICAL DIAGNOSES

1. Severe coronary sclerosis.
2. Focal myocardial fibrosis.
3. Focal basophilic degeneration, myocardium.
4. Pulmonary edema.
5. Chronic passive congestion, lungs.
6. Central congestion of liver.
7. Arterionephrosclerosis.
8. Cortical adenoma, left adrenal.
9. Partial gastric resection, old, well healed and functional."

"COMMENT:

The basic pathology in this case is related to the heart with evidence of previous small infarctions and evidence of myocardial damage. Although no definite coronary thrombosis was seen the degree of sclerosis was sufficient to cause the changes seen. The pulmonary edema, passive congestion of the lungs and liver certainly all point and relate to the basic cardiac pathology."

In November 17, 1964, Dr. Robert D. Martin, M.D., signed the death certificate attributing death to a myocardial infarction of about two or three days duration. The Commission entered a findings and award on January 4, 1965 which was protested, and a widow's claim for compensation was filed on March 16, 1965. A formal hearing was held on December 30, 1966.

Prior to the hearing the claims file was referred to a specialist in internal medicine and cardiology, Dr. Robert E. Nenad, M.D., for his review. On Dr. Nenad's recommendation, the file was then referred to the Cardiovascular Advisory Board. This Board is composed of cardiologists who are recommended by the American Medical Association, and who serve as impartial advisors to the Commission on cardiovascular questions. The Board conducted an independent review of the file, and of Dr. Nenad's report. They also considered the opinion of Dr. John A. Udall, M.D., a specialist in cardiology, who reviewed the file at the request of the petitioner. The Board made the following report:

"COMMENTS:

The file has been reviewed at very great length, as have the very complete reviews of both Dr. Udall and Dr. Nenad.

It should be noted that the patient died of diffuse coronary atherosclerosis with multiple old infarctions and a fresh myocardial infarction, without evidence of any fresh thrombosis in any portion of his coronary arterial tree.

While the concept is offered that distress, immobilization, pain and anxiety, and perhaps hypotension as a result of tranquilizing drugs, were a factor in producing slowing of his coronary circulation, the record available to us in no way indicates that there was any period of hypotension during his surgery, immediately following his surgery, or up to the time of his death.

It is to be further observed that the treatment of severe coronary insufficiency, as well as myocardial infarction, is complete bed rest with sedation in an attempt to slow heart rate and reduce cardiac work with attendant increase in coronary filling. It is, therefore, our opinion that the

death of this patient on 11–15–64 was not the result of the injury of 7–15–64, or the surgery of 9–21–64, but was the natural consequence of a severe degree of coronary atherosclerosis."

Three doctors testified at the formal hearing in this cause. Dr. Nenad, who reviewed the file for the Commission, testified that in his opinion the fatal infarction was the result of the natural progression of decedent's underlying coronary artery disease. He stated:

"* * * but I do know that his infarction occurred at home, and I believe it was secondary to natural causes, namely, secondary to coronary insufficiency from a pre-existing, rather extensive coronary arteriosclerosis, most likely it was an arrhythmic death, an abnormal heart rhythm which was incompatible with life."

He was asked:

"Q Doctor, based on the information contained in the file which you reviewed, do you have an opinion, which you could state with reasonable medical certainty, as to whether the injury and subsequent treatment which Mr. Wones underwent in any way caused or contributed to his death on, I believe, November 15, 1964 as a result of the anterial myocardial infarction?

"A Yes, it's my opinion that his accident on September—or, correction—on July 17, 1964, and the subsequent surgery September of '64, and the other treatment during this period of time was not related to his death; rather, it was due to the natural course of his coronary artery disease and was not causally related to his employment."

Dr. Allen Cohen, a member of the Cardiovascular Advisory Board, also testified at the hearing. He was asked, and answered, as follows:

"Q And based upon your review of your (sic) of the file, did you, as a member of that Board, have an opinion that you could state with reasonable medical cer-

tainty to a causal relationship between his back injury and the subsequent treatment therefor, and his eventual death as a result of a myocardial infarction?

"A Yes, I felt there is no relationship between the injury and his death from the heart attack.

"Q And can you elaborate the basis upon which you reached this opinion?

"A Well, the strongest point was the extent of the coronary disease, which was demonstrated at the time of autopsy examination. We felt that this was the termination of a process which actually had extended over a decade and not days or hours or minutes, and that based on this background that this type of a termination or conclusion is quite common and probably unrelated to the type of injury and stress that had been described.

"Q You are of the opinion that the back injury and the subsequent surgery and the treatment for this back injury then did not hasten, accelerate, or otherwise precipitate the claimant's death as a result of this myocardial infarction?

"A No, especially the immediate, the time immediately preceding death. I thought there was no question in my mind, at least, that there was no relationship between this medical treatment before and what eventuated."

There was a definite conflict in the medical testimony given by the two preceding doctors and that given by Dr. John A. Udall, who reviewed the file and testified for the petitioner. Dr. Udall was asked and answered as follows:

"Q Doctor, reviewing these records which you have listed in your November the 7th, 1966 report, had you seen the additional drug records which were supplied at a later date that I referred to, and were you able to form a medical opinion, to a reasonable degree of medical certainty, as to whether or not the death of Mr. Wones was contributed to, aggravated by, or triggered by his Industrially related accident, his surgery, his period of

convalescence, which was rather stressful, and drug intake record, his pain and anxiety, and these factors, were you able to form an opinion as to whether his death was causally related to any of these factors which we have just related?

"A Yes, I have formed an opinion.

"Q And what is that opinion?

"A I believe that the injury suffered by the subject matter under discussion was causally related to his demise some four months later from a myocardial infarction and coronary artery disease."

Dr. Udall was of the opinion also that decedent probably died of a bad heart rhythm, arrhythmia of the heart. As has been indicated, he felt that the stress of surgery, the pain, the drugs administered (especially Thorazine, which has the effect of lowering blood pressure) brought on his death prematurely, and that if decedent had the opportunity to avoid those experiences he might have been able to continue with a margin blood supply and not have had a fatal outcome.

 It is obvious from the record that there was a definite conflict in the medical evidence. The Court of Appeals will not substitute its opinion for that of The Industrial Commission where the Commission has resolved a conflict in medical testimony. Smiles v. Industrial Commission, 2 Ariz. App. 167, 406 P.2d 885 (1965). The petitioner charges in her brief that the testimony upon which the award was based was equivocal and founded upon incomplete knowledge of the concomitant conditions relating to the injury and its sequela. We have carefully read the record of the medical testimony, and have reached the conclusion that all of the testimony is positive and unequivocal, and that a genuine conflict of medical testimony existed, which the Commission resolved. For these reasons, the award of The Industrial Commission is affirmed.

Award affirmed.

CAMERON, C. J., and STEVENS, J., concur.